Filed 3/7/25  Hudson v. Department of Corrections and Rehabilitation CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LAMEKA HUDSON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>Defendant and Respondent. | D082438<br><br><br>(Super. Ct. No. 37-2019-00050255-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge.  Affirmed.

Law Offices of David A. Kaufman and David A. Kaufman for Plaintiff and Appellant.

Rob Bonta, Attorney General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper and Julianne Kelly Horner, Deputy Attorneys General, for Defendant and Respondent.

Lameka Hudson appeals from a judgment following an order granting summary judgment in favor of her former employer, the California Department of Corrections and Rehabilitation (CDCR).  She contends the superior court erred in concluding as a matter of law that she could not prove

claims of retaliation, discrimination, and harassment in the workplace within the meaning of the California Fair Employment and Housing Act (FEHA). (Gov. Code § 12900 et seq.)  We conclude that the doctrine of collateral estoppel prevents Hudson from establishing retaliation or discrimination, and that the evidence she has adduced does not create a triable issue of material fact with respect to harassment.  Hence we affirm.

## I.    BACKGROUND

Hudson is an African American woman who served as a correctional officer with CDCR during most of the period spanning 2008 through 2017. For about the first year and one-half of her CDCR service, she worked at Pelican Bay State Prison.  The remainder of Hudson's CDCR service was at Richard J. Donovan Correctional Facility (Donovan).  During her time at Donovan, Hudson experienced two adverse employment actions that figure prominently in this appeal.

**A.    The 2016 Termination of Hudson's Employment, and the Decision of the State Personnel Board (SPB) *Revoking* This Termination**

The first of the two adverse employment actions occurred in 2016.  It was a termination of Hudson's employment, the stated basis for which was a determination by CDCR that, one day in 2015, Hudson had "left her post . . . 25 minutes before the end of her scheduled shift without permission and [had] falsely indicated on her sign-in/sign-out sheet that she [had] worked until the end of her shift."

Hudson appealed the 2016 termination to the SPB, and prevailed. Explaining his reasoning, the administrative law judge (ALJ) who presided over the matter wrote in his proposed decision that:

> "[T]he evidence established that it was common practice at [Donovan] for third watch [correctional officers] to report to their posts early and leave early without permission,

2

[and] without altering the times on the sign-in/sign-out sheets, so long as the inmate count was completed and the [correctional officers]'s relief officers had arrived. No evidence suggested [that Hudson had] attempted to conceal the fact that she left early. [CDCR] did not prove [Hudson had been] attempting to claim hours worked [that] she did not work. Rather, [Hudson] arrived to work early and left work early by approximately the same amount of time. [She] reasonably believed she was not expected to alter the ending time on the sign-in/sign-out sheet under these circumstances.

"In other circumstances, [Hudson]'s conduct might reflect poorly on her employment and CDCR. In this case, however, [Hudson] acted in accordance with the common practice tolerated by . . . supervisors. Based on the widespread common practice known to supervisors and the failure of any supervisor to notify . . . [other officers] that the practice was improper, [Hudson] reasonably believed [that] her conduct was permitted."

The SPB issued an order adopting this proposed decision. Accordingly, the 2016 termination was revoked, and Hudson's employment with CDCR was reinstated.

## B. The 2017 Termination of Hudson's Employment, and the Decision of the SPB *Sustaining* This Termination

The second of the two adverse employment actions occurred in 2017. It too was a termination of Hudson's employment. The stated basis for *this* termination was an incident involving Hudson and two sergeants, Denise Ramos and Carlos Godinez, that occurred on May 23, 2017—about three and one-half months after Hudson's employment was reinstated following the first termination.

### 1. The May 23 Incident, the Ensuing Investigation, and the Decision to Terminate Hudson's Employment

Each of the three individuals directly involved in the May 23, 2017, incident prepared and submitted a one-page report of the incident that were

3

dated the day it occurred.  Under the heading "Workplace Violence," Sergeant Ramos wrote:

> "At approximately 1100 hours while performing my duties as Facility C Yard Sergeant I responded to a Code 1 on the east yard.  I heard . . . Officer L. Hudson announce on the radio . . . [that] we have a 1 on 1 [inmate fight] on the yard.  [That afternoon,] I then informed Officer L. Hudson I needed two (2) 115's for the incident she observed at 1100 hours.  I gave Officer Hudson the inmates' information so she could write the 115's.  Officer Hudson then grabbed the paperwork and went to the Facility C Gymnasium Office to use the computer.

> "I then observed Sgt. Godinez outside the office talking to Medical staff.  I walked over to Sgt. Godinez's location.  Officer Hudson then saw me and yelled, 'You see Ramos!'  I did not know what Officer Hudson was talking about but, I informed Officer Hudson to hold on and wait until Medical staff left the office.  Once medical staff talked to me and Sgt. Godinez, I stepped into the Office and asked Sgt. Godinez to step inside.  I then closed the door.  Once inside the office I told Officer Hudson I did not appreciate the fact that [that] she [had] yelled at me and advised her that I needed those 115's before the end of her shift.  It should be noted the whole time Officer Hudson was sitting down in front of the computer looking away from me as if she was ignoring my directions.  I asked Officer Hudson if she heard me.  Officer Hudson then stood up, and yelled, 'Fuck that, I am not doing this!'

> "I informed Officer Hudson once again to lower her voice and that I was going to write her up for not writing the 115's.  Officer Hudson then yelled, 'Why are you fucking with me?  You know what!  Fuck this shit I want a Union Rep."  I asked Officer Hudson once again to lower her voice.

> "As Officer Hudson was not receptive to anything I had to say, I walked away and attempted to open the door in the office.  Officer Hudson then immediately advanced towards the exit door and slammed [it] in my face, holding me hostage.  Officer Hudson then raised her fists to her

chest area in a threatening ma[nn]er.  Officer Hudson then yelled, 'Bitch, you got me all fucked up!'

"Sergeant C. Godinez then immediately intervened by stating, 'Hudson, Hudson calm down, calm down.'  Officer Hudson then stepped back and I immediately advanced towards the door and exited the office."

Hudson described the incident differently.  In her (untitled) report, she wrote:

"On May 23, 2017, I was approached by Sgt Godinez and Sgt Ramos from 'C' facility.  I was sitting down at a table in the Facility 'C' Gym with Officers Steele, Renteria, Ingram, and Romero.  Sergeant Ramos came to the table.  She disrespectfully threw 2 pieces of paper at me which I later discovered contained the information I needed to write a RVR 115 [a Rule Violation Report] for a fight [between two inmates] on the yard.  I took the papers into the Gym Office to comply with her order to write the RVR 115.  She and Sgt Godinez came into the office and closed the door.

"I was going to ask Sgt Ramos for help writing the RVR 115.  Before I could ask for help, Sgt Ramos interrupted and yelled, 'You need to wait!  You need to wait!'  I asked her for help with the RVR 115.  She yelled, 'I am tired of your disrespect!'  I calmly replied, 'Can you please help me with my 115?'  Instead of helping me she grabbed the paperwork and said she would write me up for refusing to write the RVR 115.  I stopped talking, and she left."

Godinez characterized the incident in a manner that tended to corroborate Ramos's rendition.  In a report with the same heading as Ramos's report ("Workplace Violence"), he wrote:

"On Tuesday, May 23, 2017 . . . I walked over to the desk located adjacent to the Facility C Gym Observation.  I observed Sergeant D. Ramos hand Officer L. Hudson a CDCR-128 chrono with the names of the two inmates who [had been] involved in a physical altercation earlier.  Sergeant D. Ramos advised Officer L. Hudson to complete a Rules Violation Report on [a computer program known as the]

5

Strategic Offender Management System as she was a witness of a physical altercation between [inmates].

"I proceeded to the doorway of [the] Facility C Gym office, where I spoke to medical staff.  During my interview with medical staff, I heard Officer L. Hudson yell from inside the Facility C Gym office, 'You see, Ramos!' to Sergeant D. Ramos who was standing outside the office.  Sergeant D. Ramos then stated, 'Hold on, Hudson.'

"At the conclusion of the interview . . . Sergeant D. Ramos and I then entered the Facility C Gym office.  Sergeant D. Ramos then closed the door behind me, and informed Officer L. Hudson that she did not appreciate Officer Hudson yelling at her.  She advised Officer Hudson that the Rules Violation Report must be completed by the end of the shift.  Officer Hudson stood up from her chair and stated, 'Fuck that, I'm not doing it.'  Sergeant D. Ramos advised Officer Hudson that if she did not complete her Rules Violation Report, she would be written up.  Officer Hudson stated, 'You know what?  Fuck this shit, I want a rep.'

"I intervened, and advised Officer Hudson to calm down, lower her voice, and have a seat.  As Sergeant D. Ramos turned around and began to open the office exit door, Officer L. Hudson quickly advanced towards the door, slamming the door in Sergeant D. Ramos' face and positioning herself between the exit door and Sergeant D. Ramos.  Officer Hudson then raised her fists up to her chest and taking a fighting stance, stated, 'Bitch, you got me all fucked up.'

"I immediately advised Officer Hudson to calm down and step back.  Officer Hudson then lowered her fists and took a step back.  Sergeant Ramos and I immediately opened the office door and departed the office, leaving Officer Hudson in the office by herself."

An investigation by Donovan's Investigative Services Unit (ISU) commenced immediately following the incident and yielded six additional one-page reports from personnel (five correctional officers and a sergeant) who had been present in the area outside the gym office at the time of the

incident. Three of these reports mentioned the portion of the interaction among Hudson, Ramos, and Godinez that had occurred before the three of them entered the gym office. But none of the reports corroborated Hudson's characterization of Ramos's conduct toward her as disrespectful, and none offered any insight into what had happened in the gym office. In the words of the report from one of these officers, Laverne Steele: when Ramos and Godinez followed Hudson into the office, they "closed the door behind them," and "I did not hear anything that was being said due to the door being closed."

At the conclusion of the investigation, ISU Lieutenant Gabriel Hernandez prepared a CDCR Form 989 Confidential Request for Internal Affairs Investigation/Notification of Direct Action report that described the incident much as Ramos and Godinez had reported it and that drew conclusions adverse to Hudson. In the words of the Form 989 the report stated: "It appears that Officer Hudson was dishonest in the memorandum she authored. Her conduct was unprofessional, offensive and displayed violence toward a supervisor by raising her fists and taking a fighting stance."

On June 20, 2017, Daniel Paramo (the Donovan prison warden) reviewed and signed off on the CDCR Form 989 report and submitted it to the CDCR's Office of Internal Affairs (OIA), requesting authorization to take direct adverse action against Hudson "as a result of her reported misconduct on May 23, 2017."

As related by Paramo: On July 19, 2017, OIA approved the request; and then, on October 6, 2017, Paramo in consultation with officials from CDCR's Inspector General's Office and its Office of Legal Affairs decided to terminate Hudson's employment, effective October 27, 2017. According to

7

Paramo, "the allegation most relevant to my penalty determination against Ofc. Hudson was the allegation that she [had] not [been] forthright, and in fact [had] lied and omitted crucial facts, during the investigation of her actions."

### 2. Hudson's Additional Reports

While the proceedings described above were underway, Hudson wrote two additional reports regarding the May 23 incident: a June 16, 2017, report directed to the Secretary of CDCR, and a September 9, 2017, report directed to the OIA.

In her June 16 report to the Secretary of CDCR, Hudson described the incident in the gym office in a way that added some elements not included in her May 23 report. Among these additional elements were allegations that, during the incident, Ramos had improperly denied Hudson's request to have a union representative present on her behalf and had "held [Hudson] captive in the . . . gym office . . . [by] clos[ing] the door and block[ing] the doorway to prevent [her] from exiting."

In her September 9 report to the OIA, Hudson—who by then had learned the contents of Ramos and Godinez's reports and become aware of the fact that CDCR was seeking to terminate her employment—requested that Ramos and Godinez be investigated. In support of this request, she made accusations of false imprisonment, denial of union representation, discourteous treatment, and violations of CDCR's equal employment opportunity (EEO) policy. In addition, she added elements that had not been

8

included in her May 23 and June 16 reports[1]—including, among such additional elements, information about the sex and race or ethnicity of at least seven of the individuals involved:

"To: Office of Internal Affairs

"Subject: Supervisor Misconduct

"On May 23, 2017 at 10:30 AM while I, Officer L. Hudson (African American female), was working on Charlie facility as the yard three officer, I was observing Charlie yard's inmate activity when I saw two inmates fighting in front of building 13. I transmitted over the institutional radio to put the yard down so that myself and the other yard staff could deescalate the fight. The fight was deescalated and both inmates were escorted to Charlie yard gymnasium.

"At approximately 1300 hours while sitting at a table with Officers Steele (Black female), Renteria (Hispanic male), Ingram (White male), and Romero (Hispanic male), I was approached by Sergeant D. Ramos (Hispanic female). She disrespectfully threw two pieces of paper in front of me. She told me to write a RVR (Rules Violation Report) 115 for the inmates involved in the fight since I was the officer who put the yard down. I respectfully complied with her order.

"I asked Officer L. Steele if she could help me with the 115 process because I did not know how to use the SOM[S] computer program. I went into the 'C' gym office (14 ft by 7 ft) to write the RVR 115 on the computer. I heard Sergeant D. Ramos give Officer Steele a direct order not to come into

_____

[1]     Hudson acknowledges the absence from her May 23 report of some of the elements included in the June 16 and September 9 reports, and attributes that absence to her having been affected by stress and anxiety at the time she prepared her May 23 report (which was in the immediate aftermath of the May 23 incident).

9

the 'C' gym office where the computer was located to help me.[2]

"Sergeants D. Ramos and C. Godinez (Hispanic male) entered the office while I was sitting down at the computer desk. They closed the door behind them. Sergeant D. Ramos violated policy by yelling she 'was tired of my disrespect!' Sergeant Godinez took no action to stop her unprofessional and disrespectful conduct. I stated I felt I was being verbally attacked and responded: 'What you guys are not going to do is boguard[3] me. I want my union rep!'

"I rose from my chair and walked towards the door. I did this in an attempt to remove myself from a hostile environment. If I could find a less hostile environment I could finish the task I was ordered to do: write a RVR. [Ramos] was stubbornly standing in front of the gym office door blocking my exit. As I closed the distance in an attempt to exit, she refused to move from the exit[,] illegally violating my personal liberty. She yelled at me in a menacing tone, 'Get out of my face!' I was trapped inside the office with these two sergeants. I asked her to please move out of the way, so I could get out of the office. She refused.

"I went back to the desk to sit down and work on writing the RVR. I began to refer to the paperwork with the information I needed to write the RVR when Sergeant D. Ramos snatched the paperwork away from me. She exclaimed, 'Well I'm going to write you up for refusing to write the 115!' [Note: The closed door discussion was used to accuse me of being disrespectful and now of willful

---

2    Steele's report makes no mention of having been asked to come into the gym office, or of having been ordered *not* to come into the gym office; however, an ALJ presiding over an appeal (discussed below) of the 2017 termination has determined that Steele did in fact hear Hudson call out her name and was in fact told by Ramos or Godinez not to enter the gym office.

3    According to Hudson's response to an interrogatory, the term "bogart" (misspelled "boguard" in the above-quoted report) is derived from the "most consistent screen persona" of actor Humphrey Bogart and "means to intimidate someone or get pushy or to bash somebody in the face."

10

disobedience. I asked for union representation but was denied.]

"[Ramos and Godinez] finally walked out of the office. Sergeant Godinez never advised me of my right to file an EEO complaint, nor did he report Sergeant D. Ramos['s] misconduct in the days to follow."

"I asked Officer T. Ingram to help me finish my 115 report. He agreed. As I was continuing my work on the RVR 115, ISU. . . Sergeant Segovia entered the office and saw me crying. I called my union rep, Officer Carey. Sergeant Segovia asked me if I was okay. He told me to gather all of my belongings and come with him. I informed [him] I was finishing the 115 [that] Sergeant D. Ramos [had] asked me to write. He said, 'Don't worry about it.' I complied. I was escorted off 'C' facility by Sergeant Segovia to the Employee Relations Office. I was told to write a memo while I was stressed. I finished my memo. I was told I could go home."[4]

The record furnishes no indication as to what became of either Hudson's June 16 report to the Secretary of CDCR or her September 9 report to the OIA. But it does reveal what happened to her employment status thereafter. She was terminated effective October 27, 2017, and she then filed an appeal with the SPB.

---

[4] According to Paramo: "I was never contacted by the [OIA] in regard to any complaint submitted by Ofc. Hudson to the [OIA] and have never seen any memorandum or other written complaint submitted by her or relating to her or her termination." It is not clear whether this statement is intended to refer only to Hudson's September 9 report to the OIA or also to her other two reports (i.e., the May 23 report to Paramo and the June 16 report to the Secretary of CDCR). Elsewhere, Paramo acknowledges he did see Hudson's May 23 report before he requested authorization to take direct adverse action against Hudson.

11

### 3. The Administrative Appeal, and the Ensuing Order of the SPB Sustaining the 2017 Termination

At an evidentiary hearing presided over by an SPB ALJ, Hudson denied the allegations on which the 2017 termination had been based and asserted that that termination had been "taken in retaliation for her having successfully defended against" the 2016 termination.

But the ALJ disagreed.

In a detailed 23-page proposed decision, the ALJ stated that Hudson's testimony was "suspect,"[5] that Ramos and Godinez's testimony was

---

[5] The ALJ premised his finding that Hudson's testimony was "suspect" on "the number of discrepancies in [her] various versions of what [had] transpired on May 23," and he cited four examples of such discrepancies. One example pertained to Hudson recanting on the stand her allegation that Ramos had disrespectfully thrown documents at her immediately before they entered the gym office. A second example pertained to inconsistencies in Hudson's explanation of why she called out to Steele. A third example pertained to Hudson having omitted from her September 9 report the assertion in her May 23 report that she had calmly asked Ramos to assist her in writing the RVR. The fourth example pertained to Hudson having omitted from her May 23 report the allegation, on which she "placed . . . great . . . emphasis" in her September 9 report, that "Ramos [had] prevented [her] from leaving the [gym] office, causing [her] to feel 'trapped' and 'threatened.' " In the words of the ALJ: "Even if [Hudson had been] feeling a great deal of stress and anxiety while drafting her May 23 memorandum, it is highly suspicious that [she] would fail to include such a significant detail if, in fact, it [had] actually occurred."

"credible,"[6] and that the sergeants' testimony should be credited over Hudson's testimony where their accounts differed. On this basis, he made findings that were largely in keeping with the reports of Ramos and Godinez. These included a finding that, whereas Ramos had "attempted . . . to deescalate the situation" by "leav[ing] the office," Hudson had "responded by standing up[,] moving past Sergeant Godinez and, as Sergeant Ramos opened the office door several inches in order to leave, . . . slamm[ing] the door shut, . . . ball[ing] her hands into fists and, while raising her fists up close to her chest, loudly stat[ing] to Sergeant Ramos, 'Bitch, you got me all fucked up.'"

On the basis of his findings, the ALJ concluded (among other things) that:

> "[Hudson] knew she had a duty to treat her supervisor in a respectful, obedient manner. [Hudson] intentionally failed in that duty when, after Sergeant Ramos directed her to complete the RVR by the end of her shift, [Hudson] responded, 'Fuck that, I'm not doing this.' [Hudson] further intentionally neglected her duty by blocking Sergeant Ramos from leaving the office and stating, 'Bitch, you got me all fucked up,' while acting in a physically aggressive manner towards Sergeant Ramos.
>
> "[Hudson] knew she had a duty to submit a memorandum to [CDCR] that clearly delineated the events of May 23

---

6      The ALJ premised his finding that Ramos and Godinez's testimony was "credible" on several observations. These included an observation that each sergeant's testimony was largely consistent with his or her report and with the testimony and report of the other sergeant, an observation that "no evidence was presented to give any indication as to why Sergeant Godinez would be willing to jeopardize his career by providing false information concerning [Hudson]," and an observation that the sergeants had only "limited . . . interactions" with Hudson, had no involvement in the 2016 termination, and did not appear to have any reason to be biased against Hudson or to provide less than truthful testimony concerning the incident.

without omitting any pertinent details. [Hudson] intentionally failed in that duty when she submitted her May 23 memorandum. [Hudson] failed to mention her own misconduct, while dishonestly asserting that Sergeant Ramos had treated her in an improper manner. As a result, inexcusable neglect of duty has been established as a cause for discipline."

"Sergeant Ramos was authorized to direct [Hudson] to complete the RVR, and authorized to leave the office when she chose to do so. [Hudson]'s profane, physically aggressive comments and actions towards Sergeant Ramos were clearly mutinous and contumacious. As such, insubordination has been established as a cause for discipline.

"[Hudson] had a duty to provide a truthful memorandum to Respondent concerning the May 23 incident that included all pertinent facts. [Hudson]'s May 23 memorandum was plainly dishonest, as [Hudson] asserted that Sergeant Ramos, not [Hudson], had acted in a hostile and aggressive manner during the altercation. Although [Hudson] may have been experiencing a great deal of stress at the time, no excuse exists for a peace officer to fail to include the details of her own misconduct when submitting an official report concerning an incident. [Hudson] essentially double[d] . . . down . . . on her initial dishonesty when she submitted her September 9 memorandum that again accused Sergeant Ramos of misconduct, while omitting [Hudson]'s own transgressions. Accordingly, dishonesty has been established as a cause for discipline.

"[Hudson] clearly acted in a hostile and abusive manner towards Sergeant Ramos when, after being directed by Sergeant Ramos to complete an RVR, [Hudson] responded, 'Fuck that, I'm not doing this,' and 'You know what, fuck this shit. I want a union rep.' [Hudson] thereafter acted in a physically aggressive manner towards Sergeant Ramos by blocking her exit from the office and, while raising her fists to her chest stating, 'Bitch, you got me all fucked up.' [Hudson]'s conduct plainly falls outside the normal dictates of civilized behavior, thus, discourteous treatment has been established as a cause for discipline.

14

"As previously discussed, [Hudson] knew she had a duty to treat Sergeant Ramos in a respectful manner and to accurately document her altercation with Sergeants Ramos and Godinez. Despite such knowledge, [Hudson] failed to comply with [such] duties. Therefore, willful disobedience has been established as a cause for discipline.

"[Hudson] acted in an extremely disrespectful and physically aggressive manner towards her supervisor. Such conduct by [Hudson] could easily serve to disrupt the public service, particularly if other employees determined that they too could ignore and threaten their supervisors. [Hudson]'s dishonest statements in her May 23 memorandum concerning the incident with Sergeants Ramos and Godinez also brought discredit both to her employment and to CDCR, as the public has a right to expect that the peace officers it employs will not willfully provide false statements in the written reports they submit. As such, other failure of good behavior has been established as a cause for discipline."

On the basis of these and other findings and conclusions, the ALJ determined in his proposed decision that CDCR had proven by a preponderance of the evidence that Hudson's conduct "constitute[d] legal cause for discipline" in response to "inexcusable neglect of duty, . . . insubordination, . . . dishonesty, . . . discourteous treatment of . . . other employees, . . . willful disobedience . . . and . . . failure of good behavior" within the meaning of subdivisions (d), (e), (f), (m), (o), and (t) of Government Code section 19572, respectively.

The ALJ further determined that Hudson's behavior had constituted an egregious violation of the trust reposed in her, and that this violation of trust warranted termination of Hudson's employment:

"The SPB, following California law, has consistently determined that peace officers are held to a higher standard of conduct than non-peace officers. [Citation.] A peace officer's job is a position of trust, and the public has a right to the highest standard of behavior from those they invest with

15

the power and authority of a law enforcement officer. [Citation.]

" 'Honesty, credibility and temperament are crucial to the proper performance of an officer's duties. Dishonesty is incompatible with the public trust.' [Citation.] Because of the special position of trust peace officers hold, dishonesty by peace officers warrants harsh punishment. [Citation.] Dishonesty is not an isolated act; it is more a continuing trait of character. [Citation.]

"Significant harm occurs to the public service when a peace officer acts in a hostile, profane, and physically aggressive manner towards a supervisor after the supervisor has issued a directive that the supervisor is entitled to give and have obeyed. No good cause exists for [Hudson]'s antagonistic responses to Sergeant Ramos, and [Hudson]'s actions served to significantly undermine the good order necessary for the successful functioning of a penal institution. [Hudson]'s dishonest statements and willful omissions from her May 23 memorandum also significantly harmed the public service. [Hudson] attempted to portray a series of events that did not occur in order to extricate herself from being disciplined for acting in such a highly improper manner towards her supervisor. Such efforts by [Hudson] are simply inexcusable."

As mitigating considerations, the ALJ stated that Hudson "had been employed for approximately nine years prior to the incident in question," "ha[d] no record of prior formal discipline,"[7] "generally appear[ed] to have been well-regarded by at least one former supervisor," and "might have believed that she was being 'picked on' by her supervisors."

But, the ALJ determined, these mitigating considerations did not offset the egregiousness of Hudson's behavior. The mitigating considerations notwithstanding,

---

[7] In making this statement, it appears the ALJ was disregarding the 2016 termination, which (as discussed *ante*) had been reversed.

16

"[Hudson]'s conduct on May 23 was unprovoked and extremely egregious. [N]o excuse whatsoever exists for [Hudson]'s misconduct, particularly her dishonesty. Moreover, [Hudson] has steadfastly refused to accept any responsibility for her role in the incident. As such, the likelihood of recurrence is unacceptably high."

So holding, the ALJ determined "that dismissal is the just and proper penalty for [Hudson]'s proven misconduct."

In arriving at the conclusion that Hudson's conduct constituted legal cause for discipline warranting termination of her employment, the ALJ also determined that Hudson's assertion that the 2017 termination had been "in retaliation for her having successfully defended against" the 2016 termination was without merit. In the words of the ALJ: The "affirmative defense that [Hudson] has been retaliated against [for] having successfully challenged [the 2016 termination] is rejected."

After the afore-quoted proposed decision of the ALJ issued, the SPB issued an order adopting the proposed decision. In so doing, the SPB sustained the 2017 termination.[8]

## C. The Present Lawsuit

After the SPB issued its order sustaining the 2017 termination, Hudson filed this lawsuit in superior court.[9] In an amended complaint in the lawsuit, she alleged several claims pursuant to section 12940 of the Government

---

[8] We refer to the ALJ's proposed decision sustaining the 2017 termination and the SPB's order adopting that proposed decision, collectively, as the Second SPB Order. (The First SPB Order was the one adopting the proposed decision reversing the 2016 termination.)

[9] Hudson asserts that, in addition to filing this lawsuit, she sought review of the Second SPB Order "via mandamus petition," but no indication of a mandamus proceeding having been initiated appears in the record on appeal.

Code.  These included:  (1) retaliation; (2) discrimination based on race and gender; and (3) race-based harassment.

CDCR filed a motion for summary judgment.  The superior court granted the motion and entered judgment accordingly.  Hudson timely appealed.

## II.   DISCUSSION

On appeal, Hudson contends the superior court erred in concluding as a matter of law that she could not prove any of the claims she had alleged in her amended complaint and in granting summary judgment on that basis. The judgment having been premised on an order granting summary judgment, we review the matter de novo.  (*Maksimow v. City of South Lake Tahoe* (2024) 106 Cal.App.5th 514, 521 ["We review an order granting summary judgment de novo"].)

## A.   The Retaliation Claims

As noted above, Hudson has asserted a claim of retaliation.  In support of this claim, she has cited Government Code section 12940, subdivision (h), which makes it "unlawful . . .  [¶]  [f]or any employer . . . to discharge . . . or otherwise discriminate against any person because the person has opposed

18

any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]."[10]

In challenging the grant of summary judgment on the retaliation claim, Hudson points out that "[t]his is a situation of competing narratives" and that there is "evidence to support both narratives." Then she proceeds to make two arguments that contradict one another. The first argument appears to be directed at the summary judgment standard. It is that "reasonable minds could differ in their respective credibility determinations and assessments of whose narrative is more deserving of credence." The second argument is directed at her ultimate burden of persuasion in the case. This argument is that "the narrative put forth by CDCR . . . falls apart

---

[10] Hudson also has alleged a failure to prevent retaliation and has cited Government Code section 12940, subdivisions (h) and (k) in support of this allegation. We note that subdivision (h) of section 12940 does not pertain to prevention of retaliation, and that the case law is mixed as to whether subdivision (k) should be interpreted as pertaining to the prevention of harassment. (Compare, e.g., *Department of Fair Employment & Housing v. M&N Financing Corp.* (2021) 69 Cal.App.5th 434, 444–445; *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1239–1240. However, in all events, a claim that CDRC failed to prevent retaliation cannot succeed absent a predicate determination that retaliation itself occurred (cf. *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1166 ["[w]here . . . a plaintiff cannot establish a claim for discrimination, the employer as a matter of law cannot be held responsible for failing to prevent same"]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [" 'there's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen' "]); and, as we explain *post*, Hudson is collaterally estopped from establishing retaliation.

19

completely when the details are scrutinized"[11] (or, as she framed it below, that "90% of both sergeant[s'] statements were complete fabrications, with no basis in truth or fact whatsoever").

But neither argument helps Hudson with her retaliation claim because the issue of retaliation has already been fully and fairly litigated, and decided against Hudson, in the SPB proceedings that culminated in a "rejection" of her retaliation defense. Simply stated, that rejection collaterally estops Hudson from establishing retaliation as an affirmative claim in her

---

[11] Hudson makes numerous assertions in support of her argument that CDCR's narrative does not withstand scrutiny. For example, she says the reports of Ramos and Godinez are not trustworthy because they show signs of "collusion." She says the reports' depictions of Hudson's conduct during the May 23 incident epitomize "the caricature of the angry, ghetto black woman, . . . displaying open and shocking insubordination and must have been "pulled from some B-movie or late night TV show that . . . crassly exploited black stereotypes in the form of [individuals who are] angry and unable to express themselves in anything other than profanity and ghetto slang." And she asserts the sergeants' account of Hudson having slammed the gym office door in Ramos's face is "patently absurd" and "a physical impossibility" because the door was an inward opening door. Drawing on these arguments, Hudson concludes that "the record abounds [with evidence] that casts doubt on the credibility and legitimacy of both Sgts. Godinez and Ramos and the narrative that they peddled."

lawsuit.[12]  In this regard, we note that it "has long been recognized that collateral estoppel not only prevents relitigation of court findings, but also may be applied to the decision of an administrative agency when that agency is acting in a judicial or quasi-judicial capacity." (*Basurto, supra,* 211 Cal.App.4th at p. 878; see also *Murray, supra,* 50 Cal.4th at p. 867 ["[i]t is settled that the doctrine of collateral estoppel or issue preclusion is applicable to final decisions of administrative agencies acting in a judicial or quasi-judicial capacity"].)  We further note that this principle applies in the context of litigation under the FEHA.  (See, e.g., *Johnson v. City of Loma Linda*(2000) 24 Cal.4th 61, 76 (*Johnson*) ["[w]e conclude that when, as here, a public employee pursues administrative civil service remedies, receives an adverse finding, and fails to have the finding set aside through judicial review procedures, the adverse finding is binding on discrimination claims under the FEHA"]; *Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477,

---

[12]    Collateral estoppel, also known as issue preclusion, is an " 'aspect of the concept of res judicata' " (*Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 877 (*Basurto*), that " 'precludes relitigation of issues argued and decided in prior proceedings.' " (*Ibid*; see also *Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860, 867 (*Murray*) ["[c]ollateral estoppel. . . operates as an estoppel or conclusive adjudication as to . . . issues in [a] second action [between two parties] which were actually litigated and determined in [a] first action" between the same parties].)  Hudson "contends . . . collateral estoppel is a novel argument" that was "never raised at the trial court level;" but the record reveals that CDCR did in fact argue collateral estoppel in the superior court.

485-486; *Murray,* at pp. 866-879; *Meridien Financial Services v. Phan* (2021) 67 Cal.App.5th 657, 692.)[13]

Moreover, Hudson is estopped not only as to matters that were *actually* litigated in the administrative proceeding,[14] but also as to closely associated matters that *could* have been litigated therewith.  Indeed, as the case law has emphasized:  "It is axiomatic that a final judgment serves as a bar not only to the issues litigated but to those that could have been litigated at the same

---

[13]    Hudson cites *Ruiz v. Department of Corrections* (2000) 77 Cal.App.4th 891 for the proposition that a state employee's resort to the SPB for the purpose of seeking reinstatement of employment does not preclude resort to the trial courts for the purpose of vindicating her right to be free from discrimination or retaliation.  In support of this argument, she correctly quotes *Ruiz*'s statement to the effect that "we hold state employees may pursue their claims of employment discrimination with either the [SPB] or the [Department of Fair Employment and Housing] or both."  (*Id.,* at p. 900.)
    But to say that an employee may pursue remedies in both fora is not to say that determinations made in one forum are to be stripped of their collateral estoppel effect in the other forum.  As numerous courts have held, "[g]iving preclusive effect to prior administrative findings in appropriate cases furthers the policies underlying the collateral estoppel doctrine, in that it 'promote[s] judicial economy by minimizing repetitive litigation,' prevents 'the possibility of inconsistent judgments which may undermine the integrity of the judicial system,' and protects parties 'from being harassed by repeated litigation.' " (*Basurto, supra,* 211 Cal.App.4th at p. 878; citing *People v. Sims* (1982) 32 Cal.3d 468, 488-489; see also *Johnson, supra,* 24 Cal.4th at p. 75 ["the value of 'enforcing repose' is furthered by precluding a FEHA claim that would relitigate facts already determined by an administrative agency"].)

[14]    In her opening brief, Hudson states that the "protected activity" that led CDCR to retaliate against her was:  "winning her job back after the first discriminatory dismissal [i.e., the 2016 termination], and then submitting a memo to CDCR OIA [the September 9 report] alerting her employer to race and gender discrimination before her dismissal."  As discussed above, each of these activities was considered by the ALJ and SPB and thus actually litigated.

time." (See *Takahashi v. Board of Education* (1988) 202 Cal.App.3d 1464, 1481; accord *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 557 ["[r]es judicata not only precludes the relitigation of issues that were actually litigated, but also precludes the litigation of issues that could have been litigated in the prior proceeding"]; *Federal Home Loan Bank of San Francisco v. Countrywide Financial Corp.* (2013) 214 Cal.App.4th 1520, 1529 [same].) In the words of our high court:

> "If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it. . . . The reason for this is manifest. A party cannot by negligence or design withhold issues and litigate them in consecutive actions. Hence the rule is that the prior judgment is *res judicata* on matters which were raised or could have been raised, on matters litigated or litigable."

(*Sutphin v. Speik* (1940) 15 Cal.2d 195, 202; accord *Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 575.) Hence, even if Hudson were to allege that her 2017 termination was in retaliation for activities in which she engaged that were *not* made a subject of the SPB proceedings, the SPB order would *still* estop her from establishing retaliation in this case. [15]

## B.   The Discrimination Claims

In addition to asserting a claim of retaliation, Hudson also has asserted claims of discrimination on the basis of race and gender. In support of these claims, she has cited Government Code section 12940, subdivision (a), which

---

[15]    To the extent Hudson may contend that CDCR retaliated against her for activities *other* than the two she identified in her opening brief, she could and should have surfaced those activities in the administrative proceeding. If there are any such other activities that she failed to surface and litigate in that proceeding, she is collaterally estopped from litigating them in this lawsuit.

makes it "unlawful . . . [¶] [f]or an employer, because of the race, . . . [or] gender . . . of any person, . . . to discharge the person from employment . . . or to discriminate against the person . . . in terms, conditions, or privileges of employment." For the purpose of determining whether discrimination based on race or gender has occurred, " 'California has adopted [a] three-stage burden-shifting test.' "[16] (*Department of Corrections & Rehabilitation v. State Personnel Board* (2022) 74 Cal.App.5th 908, 923 (*Department of Corrections*), quoting *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

At stage one of this test, " 'the plaintiff [has] the initial burden to establish a prima facie case of discrimination' " by " 'at least show[ing] " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion." ' " ' " (*Department of Corrections, supra,* 74 Cal.App.5th at p. 924, quoting *Guz, supra,* 24 Cal.4th at pp. 354-355.) Although the specific elements of a prima facie case may vary depending on the particular facts, in general a plaintiff must provide evidence that: (1) she was a member of a protected class, (2) she was performing competently in the position she held,[17] (3) she suffered a termination, demotion, or other adverse employment action, and (4) some

---

[16] Exceptions exist (see, e.g., § 12940, subd. (a)), but they are not implicated in this lawsuit.

[17] In a situation in which a plaintiff has been *denied* a position, as opposed to having been *terminated* from a position, she must provide evidence that she "was qualified for the position sought." (*Department of Corrections, supra,* 74 Cal.App.5th at p. 924; accord *Guz, supra,* 24 Cal.4th at p. 355; cf. *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1369 (*Jones*).)

24

other circumstance suggests discriminatory motive. (*Department of Corrections,* at p. 924; accord *Guz,* at p. 355; cf. *Jones, supra,* 152 Cal.App.4th at p. 1369.) " 'If, at trial, the plaintiff establishes a prima facie case, [then] a presumption of discrimination arises,' " and this presumption triggers stage two. (*Department of Corrections*, at p. 924, quoting *Guz,* at p. 355.)

At stage two, " 'the burden [then] shifts to the employer to rebut the presumption [of discrimination] by producing admissible evidence, sufficient to "raise[] a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason.' " (*Department of Corrections, supra,* 74 Cal.App.5th at p. 924, quoting *Guz, supra,* 24 Cal.4th at pp. 355-356.) " 'If the employer sustains this burden, [then] the presumption of discrimination [achieved at stage one] disappears,' " and the test advances to stage three. (*Department of Corrections*, at p. 924, quoting *Guz,* at p. 356.)

At stage three, " '[t]he plaintiff . . . [has] the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Department of Corrections, supra,* 74 Cal.App.5th at p. 924, quoting *Guz, supra,* 24 Cal.4th at p. 356.) If stages one and two have yielded "evidence from which the trier of fact could conclude [that] the employer's action was caused by unlawful discrimination, *and also* evidence that it was caused by nondiscriminatory motivations, [then] the plaintiff must prove 'discrimination was a "substantial factor" in the decision.' " (*Department of Corrections,* at p. 925, italics added, quoting in part *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203.)

Commencing as we must at the first stage of this burden-shifting test, we note that Hudson has established the first two elements of this stage. That is to say, she has demonstrated that she was a member of a protected

25

class and that her employment was terminated.  But as to the third element (that she was performing her job competently), she again bumps up against the collateral-estoppel effect of the Second SPB Order.

That order conclusively establishes that Hudson's performance on the job was so egregious as to constitute "willful disobedience," "insubordination," "neglect of duty," and a display of "dishonesty" for which "no excuse whatsoever exists."  Moreover, the order also conclusively establishes that that dishonesty not only is "inexcusable," but also is "incompatible with the public trust."[18]  Hence we understand the Second SPB Order to be a determination that Hudson was not competent.  Because collateral estoppel prevents Hudson from refuting these conclusive determinations that have already been made, she is unable to establish an indispensable element of what must be proven at stage one[19]—i.e., the element that she was performing competently—and thus cannot carry the burden of persuasion on her claims of discrimination.

---

[18]   The Second SPB Order went even further than this, likening dishonesty to "a continuing trait of character" as distinguished from "an isolated act."

[19]   It may reasonably be argued that the evidence to be considered in assessing a plaintiff's competence at the initial stage of the three-stage test should be limited exclusively to matters—such as training, education, and experience—that are objective and thus not reasonably in dispute, and should not include factors, like a performance evaluation, that are subjective and disputed.  However, the force of such an argument dissipates in circumstances, such as those present here, in which the subjective aspects of the plaintiff's job performance have been fully, finally, and conclusively evaluated in the crucible of an administrative proceeding wherein the plaintiff's competence in relation to the position from which they were dismissed has been determined to be so deficient as to render the plaintiff wholly unsuited to the position.

## C.    The Harassment Claim

In addition to her retaliation and discrimination claims, Hudson also has asserted a claim of race-based harassment in the form of a hostile working environment.  In support of this claim, she has cited Government Code section 12940, subdivision (j).  Subdivision (j) makes it "unlawful . . . [¶] [f]or an employer, . . . because of race, . . . to harass an employee."  (§ 12940, subd. (j)(1).)  It further provides that "[h]arassment of an employee . . . shall be unlawful if the entity . . . knows or should have known of this conduct and fails to take immediate and appropriate corrective action."  (*Ibid*.)  In addition, subdivision (k) of section 12940 makes it "unlawful . . . [¶] [f]or an employer . . . to fail to take all reasonable steps necessary to prevent . . . harassment from occurring."

"To prevail on a harassment claim under FEHA, a plaintiff must produce evidence they were subjected to 'offensive comments or other abusive conduct' that is (1) based on a 'protected characteristic' . . . and (2) 'sufficiently severe or pervasive as to alter the conditions of [her] employment.' "  (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 736 (*Doe*), quoting *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 871 (*Serri*).)  "To constitute harassment, the conduct must be so objectively severe or pervasive as ' "to create a hostile or abusive working environment." ' "  (*Doe, supra,* 43 Cal.App.5th at p. 736, quoting *Serri,* at p. 870.)  "Factors to consider in this context include the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance."  (*Doe*, at p. 736.)

Importantly, harassment is to be distinguished from discrimination in that:  whereas " '[d]iscrimination refers to bias in the exercise of *official actions* on behalf of the employer, . . . harassment refers to bias that is

27

expressed or communicated through *interpersonal relations* in the workplace.' "[20] (*Doe, supra,* 43 Cal.App.5th at p. 736, quoting *Serri, supra,* 226 Cal.App.4th at p. 869.)  Stated differently, "harassment focuses on situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706, italics omitted; accord *Doe*, at p. 736.)  Consequently, it has been said that harassment (as distinguished from discrimination) is "based on a type of conduct that is avoidable and unnecessary to job performance" inasmuch as "[n]o supervisory employee needs to use slurs or derogatory drawings" or the like "in order to carry out the legitimate objectives of personnel management." (*Reno v. Baird* (1998) 18 Cal.4th 640, 646; accord *Doe*, at pp. 736–737.)

In the two-page passage of her opening brief in which Hudson addresses the topic of harassment, she cites evidence comprising 49 pages from the record that she contends demonstrate race-based harassment in the

---

[20]    In the words of our Supreme Court:  " '[C]ommonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment.  These are actions of a type necessary to carry out the duties of business and personnel management.  These actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment.  Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management.' " (*Serri, supra,* 226 Cal.App.4th at p. 870, quoting *Reno v. Baird* (1998) Cal.4th 640, 646–647.)

form of a hostile working environment. We have read these 49 pages. But nowhere in them have we discerned harassment of the type and severity described above.

The first item of evidence Hudson has cited in support of her claim of a hostile working environment is an observation that Godinez made during his deposition, to the effect that the atmosphere in the gym office during the May 23 incident was "hostile." But framed in the context of the conclusive determinations of the SPB—including, for example, the conclusions that Hudson had spoken disrespectfully to Ramos, assumed a fighting stance toward Ramos, and blocked Ramos' egress— it is evident that Godinez was not describing the working environment at Donovan beyond the goings on in one particular room during a small part of one particular day. So too is it evident that the hostility to which he was referring was hostility that was being expressed by Hudson and experienced by Ramos, rather than vice versa. Certainly, the environment in that room during the May 23 incident was tense. But the tension that Hudson, Ramos, and Godinez experienced in that instant is in no way indicative of a hostile working environment *within the meaning of the FEHA*.

Turning to the remainder of the 49 pages of evidence Hudson has cited in support of her race-based harassment, we conclude that nearly all of it pertains: (1) to the May 23 incident itself; (2) to interactions (like supervisors issuing instructions or meting out discipline) that pertain to "*official actions* on behalf of the employer" rather than to "bias . . . expressed or communicated through *interpersonal relations* in the workplace" (see above, quoting *Doe, supra,* 43 Cal.App.5th at p. 736 and *Serri, supra,* 226 Cal.App.4th at p. 869) or (3) to alleged instances of nepotism or favoritism that Hudson has attributed, to such characteristics as a colleague's "marital

29

status," "friendships," or "relationship with a higher subordinate"—rather than to race.

More in keeping with the concept of harassment as contemplated within the meaning of the FEHA are allegations in Hudson's amended complaint that "Latino members of the corrections staff . . . regularly made racially derogatory references toward African-American inmates and even subordinate staff," that such behavior "was condoned and permissively allowed by . . . Warden Paramo," and that "[i]t "created a work environment that was openly racially hostile to African American corrections staff." When questioned about these disturbing allegations during her deposition, Hudson stated they were accurate. But the evidence she adduced to support the allegations was exceedingly thin. So much so that—when asked to provide examples of specific instances—she testified that she could not remember the name of any individual who had made such racially derogatory comments, and the single such instance that she did recall was one in which the derogatory comment "was taken as playful," "was brushed off," and was perceived by her as "not directly affecting me."

Racially derogatory comments are reprehensible. But, with evidence as scant, indefinite, and equivocal as this, they cannot be determined to have been so severe or pervasive as to alter the conditions of employment. Hence they do not create a triable issue of material fact sufficient to preclude summary judgment.

### III. DISPOSITION

The judgment is affirmed.  CDCR is entitled to costs on appeal.


KELETY, J.

WE CONCUR:


IRION, Acting P. J.


CASTILLO, J.

31